IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| VS. | ) | Case No. 24-00241-01-CR-W-SRB |
| | ) | |
| STEVE A. MCBEE | ) | |

**STEVE A. MCBEE'S SENTENCING MEMORANDUM
AND REQUEST FOR VARIANCE**

Steve A. McBee, by and though counsel, respectfully requests this Court sustain his objection to the criminal history point/zero-point offender issue (PSR Addendum, at 1-3)(Attachment 1), and impose a reasonably punitive variance sentence below the corrected advisory Guidelines range based on the Court's consideration of 18 U.S.C. § 3553 sentencing factors. Mr. McBee respectfully suggests that a variance sentence below the correct advisory range is "sufficient, but not greater than necessary" when considering the statutory sentencing factors.

Mr. McBee submits the following primary arguments in support of his objection to a proposed criminal history point for a $150 traffic infraction and imposition of a justified variance sentence below the advisory Guidelines range:

1.  Mr. McBee is a zero-point offender pursuant to U.S.S.G. § 4C1.1. The PSR incorrectly proposed one criminal history point for a traffic infraction that resulted in a $150.00 fine and erroneously supported that proposal with a 2006 Third Circuit decision (*Laureano*) rejected by the Sentencing Commission. The correct advisory range is 33-41 months (Level 20).

2. The nature of the offense is uncharacteristic because the loss – which predominantly drives the advisory Guidelines – does not fully reflect important contextual circumstances regarding the conduct at the heart of the offense, as illustrated by consideration of other crop insurance cases and the results therein.

3. Mr. McBee presents a lifetime of mitigating individual circumstances that strongly support imposing a variance sentence below the advisory range.

**FACTUAL SUMMARY**

Steve A. McBee is a self-made man, originally from Eastern Jackson County. He is committed to family, friends, and community, and happy to work hard at whatever task needs done, including (some would say - especially) those projects that involve some dirt, sweat, and manual labor. Letters sent in support of him voice a common refrain – throughout his life Steve has supported many with a generous spirit, limitless belief in effort and others, and a commitment to the benefits of hard work.[1]

As a child living in Independence, Missouri (PSR, at ¶ 42), Steve benefitted from a farmer letting him and his dad fish at a farm pond and spend time in a rural setting. Steve committed himself to earning what was needed to buy a family farm and ranch, where his family could all enjoy a rural "home base."

Having developed successful businesses in data cabling infrastructure and real estate, Steve was eventually able to realize his childhood dream of buying farmland. Accordingly, Steve and the entire McBee family are first-generation farmers. He had <u>no</u> real farming experience until he started buying farmland in 1998. And even then, he did not commercially farm. McBee family

---

[1] Letters of support are being submitted contemporaneous with this pleading, under separate cover delivered to the Court for its review and consideration. Copies are being provided to government counsel. The quantity of offers to provide supporting reference letters was inordinately high, so counsel affirmatively limited the number of support letters to fifty.

cultivation of crops did not begin from its primary locations in Gallatin, Missouri, until approximately 2005-2006. Within a short period of time between 2016 and 2020, however, McBee farming operations grew in size and scope at a dramatic rate, approximating 40,000 acres (owned and leased) in 2020 with crops in Missouri, Iowa, and Arkansas. By comparison, the average size of a working Missouri farm is approximately 300 acres.

The significant growth was consistent with Steve's application of a previously successful business template of aggressive growth, sustained by hard work, with positive results. The farm operation, however, grew too much, too fast, and Steve unsuccessfully confronted the situation. He could manage the physical labor demands, happily, but the unpredictable weather patterns, uncertain operating costs, inconsistent personnel resources and myriad difficulties inherent in farming operations, all overlaid on a sprawling farm footprint using different types of equipment and each plot presenting its own unique issues, were circumstances difficult to confront, especially for someone with no farming background. It was a much different undertaking than the McBee cable infrastructure and real estate businesses.

When the historic drought of 2018 hit Missouri (*See* Attachment 2)(drought map and Missouri media reports concerning the severe drought of 2018), McBee farm entities were well situated with crop insurance and a supply contract with Indigo Grain ("Indigo"). The 2018 Missouri drought was the second worst drought since the Great Drought, with 98 percent of the state experiencing dry to exceptional drought conditions. *See* [dnr.mo.gov/sites/dnr/files/vfc/2022/12/main/draft-mo-drought-mitigation-response-plan-2022-executive-summary.pdf](dnr.mo.gov/sites/dnr/files/vfc/2022/12/main/draft-mo-drought-mitigation-response-plan-2022-executive-summary.pdf). Drought maps and local news reports confirm that the 2018 drought conditions were historic, and crop yields uniformly reduced. Attachment 2.

Crop insurance, as regulated by the USDA's Risk Management Agency, offers agricultural producers financial protection against losses due to adverse events including drought, excess moisture, damaging freezes, hail, wind, disease, and price fluctuations. Although a year-to-year

3

variation exists due to prevailing weather conditions, drought and high temperature were a leading cause of indemnified losses in 14 of the 25 years since 2000, averaging 41 percent of total indemnity payments over the same period. *See* https://www.ers.usda.gov/topics/farm-practices-management/risk-management/crop-insurance-at-a-glance.

Regarding crop insurance, fields are appraised by crop insurance risk management agents both pre-harvest and post-harvest and reviewed for drought impact. In 2018, these review procedures were applied to McBee fields, with no field audit complaint raised about McBee drought/yield impact claims; McBee Farm fields suffered just like other Missouri farmers. However, McBee Farms was wholly over-extended due to the size of its recently acquired acreage and broadened scope of its farming, and Steve was not running the farm operations in a way where verifiably accurate yields could be reported.[2]

Regarding Indigo, it would purchase as much grain as McBee Farms could send its way, and at a good price. McBee Farms sold Indigo whatever it could harvest, and then also sold it whatever it could acquire from local farmers, grain storage, and co-op bulk purchasing because the cost was covered by Indigo's agreed price, with some profit still in the deal. It is uncontested that McBee Farms acquired additional grain for sale to Indigo.

Steve did not pull the plug on the claims or report the deficiency in operations. Moreover, operations were so haphazard, insufficient records were maintained to fully document additional grain purchases, which precluded fully understanding what volumes of 2018 grain sales were field grown or acquired from other sources. Within the context of the overall drought situation, fields underproduced due to the conditions, but unreliable information formed the basis for claims. There is not an absolute correlation between grain sales to Indigo and reduced bushel yields from insured fields of McBee farming entities during the 2018 severe drought. McBee entities supplied

---

[2] The same situation applied to the 2020 planting dates issue raised as relevant conduct. During that year, the scope of the operation was even larger, and some plant dates could not be confirmed.

additional corn and soybeans to Indigo from non-McBee farm production in 2018 (*e.g.*, B&S/Esbeck), purchasing corn and soybeans for resale to Indigo (*e.g.*, GFG), and selling soybeans and corn stored in McBee private storage. Still, the insurance claims were not verifiable as accurate, and they could not be because the farm operation did not permit accuracy. And Steve did not stop the claims. Steve acknowledges that the circumstance renders the 2018 insurance claims forfeit – regardless of the underlying context. And that is why he accepted responsibility and pled guilty, working out a resolution before charges were even filed. He also accepted the punitive double dip financial penalty of agreeing to a forfeiture ($3,158,923, PSR, at ¶ 1), while also facing a restitution order of $4,022,124 (PSR, at ¶ 71).

Today, Steve works regularly on the farm properties (*e.g.,* he missed his initial PSR interview because of a pelvis injury sustained while cutting tree limbs in an elevated loader) and helps with construction of McBee Coffee N Car Wash facilities. His sons are working to reverse the unsuccessful growth strategy, exiting leases and selling significant acreage to move away from any commercial cultivation of crops while paying down the substantial financial loans collateralized by the real property.[3] Steve is a recent grandparent, and as letters in support describe, he revels in being "Papa" to his new grandchildren. Importantly, and a telling indicator of his personality, Steve remains a phone call away from helping anyone who would ask for help or present with some need, and not because his lawyer can then comment on it, but because Steve has been doing whatever it takes to help someone out for his entire life, as reflected in the letters of supports sent by numerous individuals describing all manner of different circumstances where Steve stepped up to help.

---

[3] As the patriarch of the family farm. Steve historically has been required to personally guaranty collateralized bank loans that represent the significant financial liabilities created by farm real estate, other development property (*e.g.* McBee Coffee N Car Wash properties) equipment needed to service the farm and ranch acreage, and farm infrastructure. This significant obligation is reflected at PSR, at ¶ 54.

## ANALYSIS

**1. Steve McBee is a zero-point offender.**

Counsel objected to the Probation Office's suggestion that a Sentencing Guidelines criminal history point be assessed for a 2019 traffic infraction citing Steve McBee for consumption of alcohol while driving, for which he paid a $150.00 fine. The Probation Officer's response indicated that its proposed application of a criminal history point was wholly supported by *United States v. Laureano*, 162 Fed.Appx. 188 (3rd Cir. 2006). In that case, a court assessed a criminal history point after employing a specific elemental analysis concerning a prior offense for driving while possessing an open bottle of malt liquor, which the present PSR claims also justified application of the criminal history point. (PSR Addendum at pp. 2-3)(Attachment 1).

The Probation Office's reliance on *Laureano* and its analysis is misplaced. One, other courts ruled differently. *See United States v. Scott*, 1 F.3d 1243 (1993 WL 304403 (6th Cir. 1993)(because the Guidelines exclude convictions for public intoxication, no points apply for possessing an open intoxicant). Two, the elemental analysis in *Laureano* was critically reviewed as the Guidelines evolved and changes were considered.

> <u>In several cases, courts have found an offense to be dissimilar to the offenses listed in subsection (c)(1)(and therefore countable) by engaging in legal acrobatics that defy the Commission's apparent intent to allow for relatively broad categories of similarity</u>. For example, in *United States v. Laureano*, No. 05-2078, 162 Fed. Appx. 188 (3d. Cir. Jan. 17, 2006), the defendant had been previously convicted under Pennsylvania law for operating a motor vehicle while possessing an open 22-ounce bottle of "Silver Thunder" malt liquor."

Letter of Federal Public Defender – Arizona, to United States Sentencing Commission, March 13, 2007, at pp. 9-11 (emphasis supplied)(Attachment 3). Three, and controlling, the Sentencing Commission adopted language that refused the elemental analysis employed in *Laureano*, rendering the decision inapplicable. Accordingly, the PSR's reliance on the Third Circuit's

*Laureano* decision provides no guidance because the decision from 2006 relied on a particular elemental analysis <u>rejected</u> outright by the Sentencing Commission in lieu of a "common sense approach" (utilized by other circuits) for application of U.S.S.G. § 4A1.2(c)(1)-(2).

As reflected in Section 4A1.2 Application Note 12 (and discussed in the objection to the proposed criminal history point – see Attachment 1), "the court should use a common sense approach that includes consideration of relevant factors such as (i) comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct."

As outlined in the objections to the proposed criminal history point (Attachment 1) the "common sense approach" dictates that the $150.00 traffic infraction does not support imposition of a criminal history point. The objection should be sustained and Steve McBee correctly considered as a zero-point offender entitled to a -2 point offense level reduction as set forth in U.S.S.G. § 4C1.1. This corrects the advisory Guidelines range to a Level 20 (33-41 months).

2. **The statutory sentencing factors support a variance sentence below the advisory Guidelines range.**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011)(quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). As further stated in *Pepper*: "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *Id.*(quoting *Williams*, 337 U.S., at 247); *see also Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the

7

crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.").

Important here, the Guidelines and how they are applied does not always capture the context and nuance of a case and what happened, particularly when considering "loss" as a driver of the advisory range. *United States v. Koss*, 769 F.3d 558, 565 (8th Cir. 2014) ("The advisory guidelines 'seek to embody the § 3553(a) considerations, both in principle and in practice,' but the district court may vary from the guidelines based on its view that a case falls outside the 'heartland' to which the guidelines are addressed, or that the advisory range 'fails properly to reflect [the] § 3553(a) considerations' in a particular case.")(citations omitted).

The Court's considerations within 18 U.S.C. § 3553(a) include the following:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant;
>
> \*\*\*
>
> (4) the kinds of sentences available;
>
> \*\*\*
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

These factors, applied to this unique individual and this offense, support a variance sentence below the advisory Guidelines range.

### 3. The nature and circumstances of the offense support a variance sentence below the advisory range.

Mr. McBee accepts full responsibility for not properly maintaining farm operations that could submit accurate crop insurance claims, and not stopping or otherwise disclosing the systemic limitations, but instead proceeding with issuance of claims. To be clear, McBee fields suffered yield losses as the 2018 drought caused widespread crop failure. And what he did is distinct from preceding crop insurance prosecutions – which are informative for comparison and consideration of sentences imposed. For example, in *United States v. Esch*, 1:23-cr-00259-CNS (D. Colo. 2023), two farmers coordinated to purposefully tamper with rain gauges to falsely inflate crop insurance claims. The defendants agreed to restitution of $3.1 million, with a civil settlement of $3.5 million. An important note, Mr. Esch was sentenced to 2 months' imprisonment. Mr. Jagers was sentenced to 6 months' imprisonment.

Additionally, a series of Kentucky crop insurance prosecutions focused on wide-spread fraud centered on a tobacco warehouse, associated farmers, and particular crop insurance agents, all of whom coordinated on an expansive crop insurance fraud. One defendant, an elected local magistrate and farmer, coordinated with the conspirators to submit wholly false claims and was sentenced to 30 months with $728,784 in restitution; his brother-in-law was sentenced to 6 months and $718,784 in restitution, his sister sentenced to probation and community service with restitution of $263,614. *United States v. Taulbee*, 5:22-CR-00138-KKC (E.D. Kentucky 2022). A crop insurance agent, McNew, took kickbacks from numerous farmers, helping them file wholly false claims equating to $23 million in fraud losses. He was sentenced to seven years in prison. *United States v. McNew*, 5:19-CR-00188-KKC (E.D. Kentucky 2019). McNew was assisted by Timothy Snedegar, a crop insurance adjuster who falsified claims and generated false support (*e.g.,* faked photos, false documents) for bogus loss claims; Snedegar was found to be involved in losses of $2.2 million and sentenced to 36 months of custody. *United States v. Snedegar*, 5:20-CR-00019-KKC (E.D. Kentucky 2020). The facts of Mr. McBee's case are readily distinguishable from the tobacco series of cases.

9

Case 4:24-cr-00241-SRB    Document 26    Filed 10/06/25    Page 9 of 13

In *United States v. Garrett*, 3:21-CR-30091-RAL (S.D. Dist. Ct. 2021), father and son obtained crop insurance for phantom fields of crops, proceeded to trial and lost, and were sentenced to 18 and 24 months in custody with $1,045,544 in restitution. Additional cases further support imposition of a variance sentence below the advisory range for Mr. McBee. *See, e.g., United States v. Tronson*, 3:22-CR-149-01 (D. North Dakota 2024)(farmer falsified rainfall information and was sentenced to probation); *United States v. Pfaff*, 1:22-CR-00013-DLH (D. North Dakota 2022) (agency field audits revealed yield discrepancies, farmer sentenced to supervised release and restitution); *United States v. Fischer*, 21-cr-0020-SMR-HCA (S.D. Iowa 2021)(5 months in custody for farmer who falsified claims).

The examples set forth a much different factual context than what is presented to this Court for consideration concerning the sentence to impose. The comparison informs this Court's assessment of the nature of the offense, while also providing parameters to help avoid sentencing disparities.

### 4. Steve McBee's history and characteristics promote a variance sentence below the advisory range.

Prior and continuing good acts that benefit a community and individuals in it can be a basis for a favorable variance under the statutory sentencing factors. *United States v. Jefferson*, 725 F.3d 829, 834 (8th Cir. 2013)(finding the district court properly considered evidence of the defendant's "character, his commitment to the community, and his positive impact on individuals in the community" in granting a "substantial downward variance."). Courts sentence the defendant that stands before the Court on the day of sentencing. *United States v. Bryson*, 229 F.3d 425, 426 (2nd Cir. 2000). As referenced in the *Pepper* decision, the Court focused on the "most up-to-date picture of Pepper's 'history and characteristics.'" *Pepper*, 562 U.S. at 488. The *Pepper* court noted as critical information that, at the time of resentencing, the defendant had been drug free, attended college, achieved high grades, slated for a promotion at work, and was married and supporting his wife's daughter.

The focus on conduct and personal history as of the day of sentencing sheds light on the likelihood that a defendant will or will not engage in future criminal conduct, a central factor that

10

Case 4:24-cr-00241-SRB   Document 26   Filed 10/06/25   Page 10 of 13

district courts must assess when imposing a sentence. *Id.* at 492 (citing §§ 3553(a)(2)(B)-(C); *Gall v. United States*, 552 U.S. 38, 59 (2007) ("Gall's self-motivated rehabilitation ... lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts.")). The rationale set forth in *Pepper* is echoed in other cases. *See, e.g., United States v. Barnes*, 890 F.3d 910, 918 (10th Cir. 2018) (upholding sentence where the District Court varied downward in part because "[p]rior to sentencing, [defendant] had led a stable lifestyle and appeared active in his community" so his "risk of recidivism would be low to nonexistent and he posed no apparent threat to the community.").

Here, the letters of support submitted for Steve McBee make clear that he has been a consistent positive contributor to his community, always ready, willing, and able to assist someone in need, providing support and generally helping build people up when they need a hand. He supports every member of his family, provides a stable commitment to everyone in his life, and regularly works to be a positive force for the people he contacts. This pattern of good conduct has been prevalent throughout his adult life, and he is now a 53-year-old man.

The constant refrain of him possessing a significant work ethic has applied equally to the businesses he has started and personal labors, undertaken with genuine purpose, to do whatever needs to be done to help someone. These positive qualities have persisted as reflected in letters from former students and athletes he coached and mentored – now grown – that benefited from his commitment of time, labor and offering assistance whenever and however needed. A good example is presented by D'Eric Fields:

> I first met Steve when I was in the 5th grade. My mom had just moved us to the Fort Osage School District, and we didn't know anyone. As a young African American kid coming from a completely different cultural background, I felt out of place. But the first family we met was the McBees and they didn't just welcome me, they made me part of their family. Steve was my little league football coach, but more than that, he became a mentor, a role model, and really, another father figure to me.

11

> Steve didn't just coach football. He taught us what it meant to be men, how to carry ourselves with character, discipline, and integrity. He made sure we respected each other, no matter our backgrounds, and to always honor our parents and elders. He understood how to reach us. My mom, a single parent, trusted him completely. If I was with Steve and his family, she never worried, and that trust was earned.

Now Pastor Fields runs The Refuge KC and continues to benefit from constant support from Steve. The McBee farm hosts urban youth for "Kids in the Outdoors" programs that are memorable and incredibly meaningful to the youngsters that get to participate. This is merely an example. Individual after individual consistently reports Steve McBee's positive involvement in their lives and how he has helped support and promote their well-being on every level. This lifetime of helpful acts is a favorable consideration that guides the Court's discretion.

### 5. Consideration of deterrence and protecting the public weighs in favor of a variance sentence.

Steve is a grandparent with strong family support and a lifetime of no criminal history prior to this matter. Being a first-time offender sentenced in your 50s is a strong indicator that deterrence and protecting the public are not a major concern, instead age may positively be viewed under the statutory factors to weigh in favor of a variance sentence. *United States v. Chase*, 560 F.3d 828, 830-31 (8th Cir. 2009) ("[F]actors such as a defendant's age, medical condition, prior military service, family obligations, entrepreneurial spirit, etc., can form the bases for a variance even though they would not justify a departure.") That analysis favors the request for a variance sentence.

### CONCLUSION

Steve McBee, and everyone that supports him, appreciate the Court's consideration of all the facts, circumstances, and information that direct the Court on what sentence to impose. Based on the foregoing circumstances that support a variance sentence, Mr. McBee respectfully requests the Court impose a sentence of supervised release with conditions as dictated by the Court.

Date: October 6, 2025                          Respectfully submitted,

                                               **s/ Jeffrey D. Morris**
                                               Jeffrey D. Morris MO Bar # 45243
                                               Courtney A. Kroeger, MO Bar # 77213
                                               Berkowitz Oliver LLP
                                               2600 Grand Boulevard, Suite 1200
                                               Kansas City, MO 64108
                                               Tel:  816-561-7007
                                               Fax: 816-561-1888
                                               Email: jmorris@berkowitzoliver.com

                                               **Attorneys for Defendant Steve A. McBee**

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of October 2025, the foregoing was submitted to the Court for filing via the ECF system, which provides notice to all parties.

                                               *s/ Jeffrey D. Morris*
                                               Counsel for Steve A. McBee