Cooper19

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>     v.<br><br>STEVE A. MCBEE,<br><br>           Defendant. | Case No. 24-00241-01-CR-W-SRB |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

## **I. INTRODUCTION AND FACTUAL SUMMARY**

Sentencing is scheduled for Thursday, October 16, 2025, before United States District Court Judge Stephen R. Bough. As more fully explained below, the Government recommends that the Court impose a sentence of 41 months' imprisonment, regardless of the Court's ruling on the defendant's objection to the Guidelines range. Additionally, the Government recommends this sentence be followed by three years' supervised release, a mandatory restitution order of $4,022,124, a forfeiture money judgment, and an order imposing the mandatory $100 special assessment.

The United States Department of Agriculture (USDA) was established to support the production of agriculture. (PSR ¶ 3.) Congress created the Federal Crop Insurance Corporation (FCIC) to provide government insurance against unavoidable, natural crop losses endured by farmers. (PSR ¶¶ 3-4.) The FCIC used private insurance companies, such as Rain and Hail and NAU Country Insurance, to provide crop insurance to farmers. (PSR ¶ 4.) FCIC reimbursed private insurance companies for insurance payments made to insured farmers and subsidized a portion of

the farmer's federal crop insurance premiums. The FCIC also reimbursed private insurance companies for their administrative costs.

In 2018, the defendant oversaw and managed his family's farming operation which conducted business through multiple corporate entities and was based in Gallatin, Missouri. (PSR ¶¶ 5,7.) As leader of the farming operation, McBee entered into a contract with Indigo Ag, Inc. (PSR ¶ 5.) Through the contract, McBee farming operations purchased all their seed for corn and soybeans from Indigo and the defendant only planted corn and soybeans from Indigo in fields he farmed in 2018. The contract also included an agreement that the McBee farming operations would sell back all the corn and soybeans harvested in 2018 to Indigo and deliver the harvested crops to grain elevators on behalf of Indigo.

McBee, as the person in charge of the farming operation, obtained federal crop insurance for his corn and soybean crops in 2018 through Rain and Hail. (PSR ¶ 6.) In order to receive an insurance indemnity payment through federal crop insurance, McBee was required to submit a "Proof of Loss" and was required to provide complete harvesting, production, and marketing records for each crop he insured and for acreage which was not insured. The Proofs of Loss submitted to Rain and Hail for crops harvested in 2018 included production worksheets. (PSR ¶ 8.) The production worksheet included a section in which the individual signing the document certified the information on the production worksheet was "true and complete," and that the individual signing the document understood the crop insurance was subsidized by FCIC and any false claims or false statements were subject to criminal penalties.

Records obtained from Indigo revealed that the McBee farming operations sold approximately 1,241,116 bushels of corn and 415,969 bushels of soybeans to Indigo for the 2018 crop season. (PSR ¶ 7.) As the head of the McBee farming operation, the defendant submitted or

caused others to submit, certified Proofs of Loss that included false production worksheets to Rain and Hail for harvested grain in 2018. (PSR ¶ 9.) The production worksheets submitted to Rain and Hail reported that 340,476 bushels of corn and 190,171 bushels of soybeans were produced by the defendant's family farming operations. (PSR ¶ 7.) Because the defendant underreported the actual grain production to federal crop insurance, McBee was paid federal crop insurance benefits to which he was not entitled.

In 2019, the defendant applied for and received federal crop insurance on soybean crops. (PSR ¶ 10.) The insurance was issued through Rain and Hail and the policy only allowed insurance coverage on the first crop planted on a piece of land during the crop year. For multiple fields that were planted with soybeans and insured in 2019, wheat had already been harvested from those fields in 2019 thereby making wheat the only insurable crop for 2019. Based on the "double cropping," McBee illegally obtained insurance indemnity payments from the federal crop insurance program.

The defendant obtained federal crop insurance on his corn crop in 2020 through NAU Country Insurance (PSR ¶ 12.) As part of the policy, the farmer was required to submit an acreage report to the insurance provider that reported all planted acreage. The acreage report contained the location, date of planting, and number of acres planted along with a certification that all the information was accurate. The insurance policy contained special provisions that specified dates applicable to certain crops. (PSR ¶ 13.) For corn, there is a final planting date for crop insurance. Corn that is not planted by the final plant date can still be planted, but the amount of insurance coverage is reduced. In 2020, the last plant date for corn in Missouri was May 25, 2020. The late planting period ended on June 14, 2020, and any corn planted after June 14, 2020, was not insurable.

The McBee farming operations planted corn after the last planting date in 2020. (PSR ¶ 14.) The defendant knowingly caused other McBee farming employees to provide inaccurate plant dates for certain crops on crop insurance documents to NAU Country Insurance. Because of the inaccurate and false plant dates, crops that should not have been insured because they were planted after the late planting period were insured at the highest level. As a result of the false statements, the defendant received federal crop insurance payments to which he was not entitled.

Based on the fraudulent documents and representations made to the federal crop insurance program by the defendant, the USDA's Risk Management Agency suffered an economic loss. The parties agree the total loss was $4,022,124.

## II. SENTENCING RECOMMENDATIONS

### A. Guidelines Calculation

Probation Officer Brown determined the base offense level was 7 for a violation of 18 U.S.C. § 1014 under U.S.S.G. § 2B1.1(a)(1). (PSR ¶ 20.) An 18-level enhancement was applied pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because the total loss amount was more than $3,500,000, but less than $9,500,000. (PSR ¶ 21.) The defendant received a three-level reduction for acceptance of responsibility resulting in an adjusted offense level of 22. (PSR ¶¶ 18, 27-29.)

The Probation Department calculated a total criminal history score of one establishing a criminal history category I. (PSR ¶¶ 35-37.) The resulting guidelines range is 41-51 months of imprisonment. (PSR ¶ 61.)

### B. Unresolved Guidelines Matters

1. <u>Assessment of Criminal History Point for 2019 Conviction</u>

The defendant has filed an objection to the Probation Department's decision to assess a criminal history point for his 2019 conviction in Daviess County, Missouri Circuit Court

4

for consumption of alcohol while driving. (PSR Addendum.) The defendant contends the conviction is analogous to a minor traffic violation similar to speeding. The Government disagrees with the defendant's characterization that the offense is a minor traffic violation and concurs with the Probation Department's assessment of a criminal history point.

Based on the records from that case, on September 21, 2019, the defendant was stopped by an officer for suspicion of driving a vehicle while consuming an alcoholic beverage. (PSR ¶ 35.) Prior to stopping the defendant, the officer observed the defendant, who was the only person in the vehicle, drinking what appeared to be a Michelob Ultra alcoholic beverage. After the defendant got out of his vehicle, the officer detected an odor of alcohol coming from the defendant. The defendant agreed to a preliminary breath sample, which returned a .05 percent blood-alcohol concentration. The officer also located an opened Michelob Ultra beer bottle, which was still cold to the touch, in the backseat of the defendant's vehicle. The defendant knowingly waived his right to an attorney and pled guilty, in exchange for the prosecutor's agreement to recommend a fine as the sentence.

U.S.S.G. § 4A1.1(c) instructs that one criminal history point is added for each prior sentence not counted under U.S.S.G. § 4A1.1(a) or (b). Section 4A1.2(c)(2) lists several offenses and states that sentences for those prior offenses and offenses similar to them, by whatever name they are known, are never counted. One of the listed offenses is minor traffic infractions and Section 4A1.2(c)(2) gives the example of speeding.

The parties agree there is no Eighth Circuit case that specifically addresses the issue of whether a conviction for consumption of alcohol while driving supports the assessment of a criminal history point. However, a case from the Third Circuit supports the Probation Department's decision to assess a criminal history point. In *United States v. Laureano,* which the

5

Probation Department cited in its response to McBee's objection, the defendant appealed the district court's decision to assign him a criminal history point for a prior conviction in Pennsylvania under 75 Pa.C.S. § 3809, which prohibits possession of an open alcoholic container or consumption of a controlled substance or alcoholic beverage in a motor vehicle on a state highway. *United States v. Laureano,* 162 Fed. Appx. 188, 189 (3rd Cir. 2006). Laureano pled guilty in 2003 to "operating a motor vehicle while possessing an open 22-ounce bottle of 'Silver Thunder' malt liquor." *Id.* The sentence Laureano received for that conviction was fine and costs totaling $217. *Id.* Laureano argued on appeal that the Pennsylvania statute he was convicted of was "sufficiently similar to, a minor traffic infraction, such that it must be excluded from his guidelines calculation pursuant to U.S.S.G. § 4A1.2(c)." *Id.* The Third Circuit affirmed and recognized that, "[u]nder § 4A1.2(c)'s default rule, the past conviction is to be counted absent grounds for exclusion" and the Court found there were no grounds for excluding the conviction. *Id.* at 191.

McBee was convicted of driving his vehicle while consuming alcohol, which is a mind-altering substance. Drinking while driving, even if McBee was not found to be substantially impaired, was potentially dangerous to other motorists and is more than a minor traffic infraction. The offense McBee was convicted of can be found in Section 577 of the Revised Statutes of Missouri. This section is entitled "Public Safety Offenses" and contains violations such as driving while intoxicated and boating while intoxicated. McBee's prior conviction was not a minor traffic violation.

If the objection is overruled, the resulting guidelines range is 41-51 months' imprisonment.

C.  **Recommended Sentence of Imprisonment and Supervised Release**

Based on the nature and circumstances of the offense and other sentencing factors set forth in 18 U.S.C. § 3553(a), the United States requests this Court impose a sentence of 41 months, followed by three years of supervised release, mandatory restitution, and a forfeiture money judgment.

1.  **Nature and Circumstances of the Offense**

McBee knowingly submitted, or caused to be submitted, false documents to the federal crop insurance program and abused a program created to assist farmers in need. His illegal conduct spanned multiple years and included different methods of deceiving the federal crop insurance program. In 2018, McBee underreported his corn production by 674,812 bushels and soybean production by 155,833 bushels. (PSR ¶ 9.) Altogether that is over 830,000 bushels of grain. For context, a semi-truck trailer carries approximately 1,000 bushels of grain. McBee underreported the equivalent of 830 semi-truck trailers of grain – a massive amount of grain. It was all done to increase his profits in the form of insurance indemnity payments and line his own pockets with millions of dollars he did not earn at the expense of U.S. taxpayers. The nature of the fraudulent conduct was self-serving and demonstrates that he was motivated by pure greed.

McBee's criminal conduct, which includes significantly underreporting his crop production, obtaining insurance on crops that were not eligible for insurance, and falsifying plant dates to ensure the highest level of insurance, do not support leniency but, instead, support a custodial sentence and offer this Court no reason to vary downward from a Guidelines sentence.

7

2. **The History and Characteristics of the Defendant**

On the surface it appears the defendant has everything: a supportive family (PSR ¶¶ 43-44), significant assets (PSR ¶ 54), and no reported mental health issues or difficulties with addictions. (PSR ¶¶ 47-48.) Yet, when faced with a direct choice between right versus wrong, legal versus illegal, McBee chose the easy and greedy path – submitting fraudulent claims to federal crop insurance to increase insurance reimbursements and cheating U.S. taxpayers to acquire even more that he did not earn, and did not deserve. Nothing about McBee's history and characteristics mitigates against a guidelines sentence in this case.

3. **The Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence to Criminal Conduct**

To promote respect for the law, to provide just punishment, and to afford adequate deterrence, a sentence of 41 months is warranted.

Fraud on the federal crop insurance program causes two interrelated harms. On the one hand, the defendant unlawfully obtained large sums of money to which he was not entitled. On the other, he stole that money from United States taxpayers.

Federal crop insurance indemnity payments serve as a safety net for farmers to ensure that if they experience difficult and unforeseen circumstances, such as a drought or inclement weather, they do not become insolvent or lose the ability to continue farming. A system like the federal crop insurance program that relies so heavily on honesty of its participants is ripe for abuse. The defendant's crime is an insult to hard working Missouri farmers who must meticulously follow the complex – yet necessary – crop insurance rules and regulations. Fraud committed against the federal crop insurance program is devastating to a program designed to benefit the very people

8

Case 4:24-cr-00241-SRB     Document 27     Filed 10/06/25     Page 8 of 12

who are taking advantage of it – farmers who were legitimate, hard-working, and law abiding, but suffered unavoidable crop losses.

The defendant's decision to submit false statements to crop insurance for years to artificially inflate his insurance indemnity payments shows a lack of respect to the law and the crop insurance program. While committing these crimes, McBee may have thought he would not be caught, or that if he was, he would escape serious punishment. McBee and other white-collar criminals should know that if they commit a crime and get caught, they will not escape with an apology, however sincere, and a slap on the wrist in the form of probation. A significant prison sentence is necessary to promote respect for the law.

The parties have discussed McBee making a payment towards restitution at sentencing. These discussions did not occur until after the Government filed the Notice and Bill of Particulars for Forfeiture of Property on August 29, 2025. (D.E. 23.) The defendant has been on bond since his change of plea hearing on November 5, 2024, and McBee knew about the Government's case several months before that hearing. The defendant has not made any payments towards restitution. Defendants in white-collar cases often argue for shorter sentences in order to better pay restitution. The sincerity of those offers should be judged by efforts made to pay restitution before sentencing.

A sentence of 41 months' imprisonment is also appropriate for general deterrent purposes, specifically the need to prevent future harm to regulated industries. In any regulated industry – be it healthcare, banking, energy production, farm/food programs, etc. – agencies must use defined and limited resources to ensure, to the fullest extent possible, 100% compliance with all rules and regulations. A participant who lies and cheats in the midst of a regulated administrative scheme not only cheats purchasers, users, and competitors – like in a normal product misrepresentation case - but also taxpayers who pay for the regulatory scheme and infrastructure, and the consuming

9

Case 4:24-cr-00241-SRB    Document 27    Filed 10/06/25    Page 9 of 12

public, whose trust in the system can be eroded by such cheaters. Indeed, those who find a way around the system of regulation through lying, deception, and cheating do more than cheat customers: they endanger the public trust. McBee is well-known in his community and a sentence of probation would send the message to other farmers that defrauding the government of millions of dollars will only result in having to pay some of it back.

**D.     Recommended Sentence for Monetary Penalties**

1.     <u>Restitution</u>

The United States requests restitution in the amount of $4,022,124 to the USDA's Risk Management Agency.

2.     <u>Forfeiture</u>

The United States requests a money judgment in the amount of $3,158,923, which represents the defendant's gain from the criminal conduct. The defendant agreed to a forfeiture money judgement in his plea agreement, and the Court has entered a preliminary order of forfeiture. (D.E. 13.)

3.     <u>Special Assessment</u>

The defendant's plea agreement requires payment of the $100 special assessment at the time of sentencing.

4.     <u>Fine</u>

In light of the need for financial restitution, the United States does not object to the Court waiving imposition of a fine.

## III. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence McBee to 41 months' imprisonment, followed by three years of supervised release, and mandatory restitution.

Respectfully submitted,

R. Matthew Price
United States Attorney

By    */s/ Bradley Cooper*

Bradley Cooper
Special Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a copy of the foregoing was delivered on October 6, 2025, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

                                                */s/ Bradley Cooper*
                                                Bradley Cooper
                                                Special Assistant United States Attorney

12

Case 4:24-cr-00241-SRB   Document 27   Filed 10/06/25   Page 12 of 12